Exhibit A

# Exhibit A

## COMMONWEALTH OF MASSACHUSETTS

**COUNTY OF SUFFOLK**

**SUPERIOR COURT TRIAL DIVISION**

Civ. Act. No. 22 84CV 1269C

| | |
|---|---|
| Kathleen Frenette,<br>Leslie Montgomery, and<br>Suzanne Zuckerman,[1]   )<br>  )<br>Plaintiffs,   )<br>  )<br>vs.   )<br>  )<br>Alexion Pharmaceuticals, Inc., now D/B/A )<br>Alexion, AstraZeneca Rare Disease )<br>and Mary Sheila Leese,   )<br>  )<br>Defendants   )<br>  ) | **RECEIVED**<br><br>JUN − 8 2022<br><br>SUPERIOR COURT-CIVIL<br>MICHAEL JOSEPH DONOVAN<br>CLERK/MAGISTRATE |

## COMPLAINT

### I.  INTRODUCTION

In a ruse to terminate older workers, Defendant Alexion Pharmaceuticals, Inc., ("Alexion"), led by its Executive Director of Patient Engagement Strategy, Defendant Mary Sheila Leese, ("Leese"), while negotiating a $39 billion acquisition by Astra-Zeneca, announced a restructuring.  It was good news.  Alexion had reported 21% revenue growth and $2.2 billion in profits on sales of $5B, and, as part of its new plan, it would be adding jobs.

For Plaintiffs **Kathleen Frenette, Leslie Montgomery and Suzanne Zuckerman,** who were all professional nurses holding the title of field focused case managers in the Neurology and Complement (a form of Immunology medicine) units – it meant that more jobs were being added. For the 85 managers in their units, there would now be 100 positions, which would mean at least 15 new hires to add to their groups. The ruse? All 85 of them would be terminated, and then needed to re-apply for the "new" positions. Despite Alexion's important written policy to

---

[1] The related matters are <u>Kathleen Frenette v. Alexion Pharmaceuticals, Inc., et al.,</u> MCAD Docket No. 21BEM01179; EEOC Docket No. 16C-2021-01165; <u>Leslie Anne Montgomery v. Alexion Pharmaceuticals, Inc., et al.,</u> MCAD Docket No. 21BEM01189; EEOC Docket No. 16C-2021-01174, and <u>Suzanne Zuckerman v. Alexion Pharmaceuticals, Inc., et al.,</u> (MCAD Docket No. 21BEM01187; EEOC Docket No. 16C-2021-01172)

"hire, assign, promote, and retain workers on the basis of their qualifications, relevant work performance and other legitimate factors," Alexion conducted subjective interviews, ignoring all qualifications, work performance and other legitimate factors. Instead, it used oral questioning and unvalidated scoring, which led to disparate treatment of the Plaintiffs on the basis of age.

Defendants filled many of the positions applied for by the Plaintiffs with younger managers, from 10-20 years younger than Ms. Frenette, 7 years younger than Ms. Montgomery, and six years younger than Ms. Zuckerman, with known rehires aged 36, 38, 43, 46 and 48. The younger successful candidates had lesser qualifications, less relevant work experience and for them, Alexion ignored other legitimate factors favoring the Plaintiffs.

Frenette, Montgomery and Zuckerman were also denied interviews for high level positions including Lead PEM, Associate Director of Patient Training and Advocacy, and Senior Manager of Patient Engagement granted to less qualified significantly younger candidates, for whom restrictions were waived or prior experience was considered. Plaintiffs were blocked by barriers not applied to younger candidates and by the failure to consider their prior qualifications and work performance.

After Plaintiffs and other older managers internally complained of age discrimination, Alexion tried to cover its tracks by concealing the ages of the chosen candidates, delaying some hiring decisions, concealing the reasons for the chosen candidates being preferred, hiring some older candidates, and retaliating against Plaintiffs by refusing to consider them for other open positions. Compounding its unlawful actions, Alexion responded to internal complaints of age discrimination by conducting insufficient investigations, and failing to correct their lack of commitment not to discriminate, in violation of its own EEO policy and continued to favor hiring younger managers.

Each Plaintiff has suffered substantial actual harm, and this action is filed to remedy that harm.

## II.   THE PARTIES

1. Plaintiff Kathleen Frenette,("Frenette") resides at 10 Baxter Court, Cheshire, CT 06410. Frenette's last position with Alexion was as a Registered Nurse Field Focused Case Manager. On September 24, 2020 Alexion notified Frenette, of her involuntary termination effective on March 1, 2021, at age 56, as part of the termination of employees due to the "elimination" of all 85 positions in their Complement and Neurology Business units. Alexion announced it would fill 100 positions, including Patient Education Manager "PEM" or "PEM lead" positions. Frenette, then age 56, applied for two PEM positions and two PEM lead positions.

2. Plaintiff Leslie Anne Montgomery, ("Montgomery") resides at 10184 Thunder Run, Littleton, CO 80125 in Colorado. Alexion employed her in the Neurology business unit and most recently as a Registered Nurse, Field Focused Case Manager. On September 24, 2020 Alexion notified Montgomery, then aged 55 of her involuntary termination effective on March 1, 2021, at age 56, as part of the "elimination" of all 85 positions in their Complement and Neurology business units. Montgomery,

applied for two PEM positions and a position as Senior Manager of Patient Engagement.

3. Complainant Suzanne Zuckerman, ("Zuckerman"), resides at 2742 Ariane Dr., Unit 157, San Diego CA 92117. Alexion employed her in both Complement and Neurology business units and most recently as a Registered Nurse, Field Focused Case Manager. On September 24, 2020 Alexion notified Zuckerman, of her involuntary termination effective on March 1, 2021, at age 53, as part of the elimination of all 85 positions in their Complement and Neurology Business units. Zuckerman applied for two PEM positions and one Associate Director of Patient Services Training and Development position. Zuckerman also applied for two Patient Navigator roles, not fully knowing what that job would entail.

4. At the time of their terminations, all Plaintiffs were professionals working as Registered Nurses directly with patients with rare diseases, with the families of those patients, and with the doctors and nurses treating those patients.

5. Defendant Alexion Pharmaceuticals, Inc. ("Alexion") is now doing business as a wholly-owned subsidiary of AstraZeneca Plc, a global biopharmaceutical company, having its name changed to "Alexion, AstraZeneca Rare Disease", as a successor corporation of Alexion Pharmaceuticals Inc. In the MCAD Response, Alexion, then having been acquired by AstraZeneca Plc, stated, "Alexion will satisfy any judgment if one should issue."  At all relevant times Alexion has had its principal headquarters at 121 Seaport Boulevard, Boston, Massachusetts, 02210. At all times relevant Alexion has been a profitable pharmaceutical company. Alexion is listed as having its current Resident Agent for service of process the Corporation Service Company, 84 State Street, Boston, MA 02109. At the time of the merger announcement, Alexion had 4,000 employees, reported 21% revenue year over year, and $2.2 billion in profits on sales of $5B, and, as part of its new plan, it would be adding jobs.

6. On about July 21, 2021 AstraZeneca PLC ("AZ") completed its acquisition of the former Alexion Pharmaceuticals, Inc.  As part of AZ's acquisition, Alexion Pharmaceuticals Inc. was a party to three mergers.

7. By operation of law, a newly renamed Alexion Pharmaceuticals, Inc. was the successor of all of the assets and liabilities of the former Alexion Pharmaceuticals Inc. (Hereinafter "Alexion").

8. Defendant Mary-Sheila Leese, ("Leese") resided in Massachusetts at all relevant times. She was Executive Director of Patient Engagement Strategy and now is Vice President of Patient Services and Strategy. She was at all times a substantial decision maker in the restructuring in 2020. Leese announced the dismissal to all employees terminated in the "Restructuring Disclosure." Leese had direct or indirect responsibility for managing the Patient Services Organization and all its positions before and after the restructuring.

## III.  JURISDICTION, VENUE AND CHOICE OF LAW

9. The Plaintiffs each exhausted state anti-discrimination agency requirements by filing a timely charge of discrimination with the Massachusetts Commission Against

3

Discrimination ("MCAD") which was cross-filed with the Equal Employment Opportunity Commission, and each has given notice of intent to withdraw that action under G.L. c. 151B §9. Within the scope of that complaint, each Plaintiff asserted claims of discrimination on the basis of age, under G.L. c. 151B § I(B), retaliation for opposing what each in good faith believed was age discrimination in violation of G.L. c. 151B §4(4), claims of failure to adequately investigate, remedy and deter discrimination, under G.L. c. 151B §4(1) and 4(4), and claims of individual discrimination against Defendant Mary-Sheila Leese, involving retaliation and personal interference with their rights to be free of age discrimination under G.L. c. 151B §4(4) and §4(4A).

10. Plaintiffs exhausted by a timely filing at the MCAD against Alexion Pharmaceuticals, Inc., now doing business as Alexion, AstraZeneca Rare Disease, and Mary Sheila Leese.

11. Alexion notified each Plaintiff of her termination from Alexion Pharmaceuticals, Inc, now D/B/A Alexion, AstraZeneca Rare Disease as of September 24, 2020, by letter from Defendant Mary Sheila Leese from Alexion headquarters in Boston, MA describing the restructuring of all positions reporting to her.

12. At all times relevant, Alexion and Leese have been conducting business, in Boston Massachusetts, overseeing, managing and controlling in the development and marketing of pharmaceutical products.

13. In June 2018, Alexion had opened its new headquarters in Boston. Boston is the primary site for Business Development, Communications, Commercial, Strategy, Development and Legal Activity. Many other functions including Government Affairs and Human Resources have a presence in Boston.

14. In implementing its restructuring Alexion employed many managers and agents who were overseen and or directed from Boston and/or who communicated from Boston with plaintiffs.

15. Alexion intended Massachusetts law to govern the restructuring. By letter from Defendant Leese or her designees in Boston, Alexion notified each affected member notified that in connection with the separation of employment, they would receive an offer of a severance and benefits package to be outlined in a summary sheet (the "Separation Package"). Alexion by Leese or her designee, offered severance agreements to the three plaintiffs and any employee terminated in the restructuring. Severance Agreements were governed by and construed under the laws of the Commonwealth of Massachusetts, without regard to its conflicts of law rules, and required the employee and Alexion to consent to the jurisdiction of the federal and state courts located in the Commonwealth of Massachusetts to resolve any disputes arising out of the Agreement.  It also required specific release of Massachusetts employment laws, and provided that affected employees would be required to cooperate fully with the Legal Department based in Boston at Alexion's expense.

16. Plaintiffs did not sign the separation agreements.

## IV.   FACTS

**The known duty not to discriminate and to maintain an environment free of discrimination and retaliation.**

17. Alexion's own important EEO Policy is entitled Equal Employment, Non-Harassment and Non-Discrimination Policy. That Policy, revised on October 7, 2019, states: "The Company hires, assigns, promotes, and retains workers on the basis of their qualifications, relevant work performance and other legitimate factors." Alexion had a duty to apply that policy equally.

18. Under other Alexion EEO policies, Alexion is also committed to compliance with all laws pertaining to equal employment opportunity in every locality where it has employees or does business.

19. Under other Alexion EEO policies, Alexion and is committed to maintaining an environment free of discrimination and harassment.

20. Under other Alexion EEO policies, Alexion is committed to providing all its members equal opportunity for development, success and fulfillment.

21. Under other Alexion EEO policies each manager and supervisor is responsible for creating and maintaining an environment free of discrimination and retaliation.

22. Under Alexion EEO policy, Alexion will not tolerate discrimination or retaliation, whether such conduct occurs on Alexion premises, at off-site assignments or meetings, at Alexion-sponsored social functions, on Alexion company business, via online or mobile communications, including social media, or in any other location, manner or context that is work-related or impacts the work environment.

23. In its restructuring model, Alexion and Leese announced they would provide a robust training program in January 2021 for all aspects of the new model.

24. Alexion supplied that EEO policy to the Massachusetts Commission Against Discrimination and responded that it was the relevant and controlling policy for the events complained of.  Every named individual respondent in the original complaint affirmed the response.

25. Defendants Alexion and Leese knew they must maintain hiring and retention decisions free of age discrimination, an environment free of discrimination in development and opportunities, and that they must not retaliate for any complaint of age discrimination.

26. During the restructuring, Alexion created a policy to minimize the impact of that reorganization on its current employees. One of Alexion's goals for the Patient Services reorganization was to achieve the new model while minimizing job loss for its employees by fulfilling the new roles with existing employees, whenever possible. Alexion had a duty to apply this policy equally.

**The Acquisition by AstraZeneca in 2020-2021.**

27. In the Spring to Fall of 2020, Alexion Pharmaceuticals Inc. of Boston, MA began searching for strategic alternatives including taking steps to become attractive to major bidders seeking to buy them to generate a new revenue stream with a robust pipeline of products.

28. In August 2020, the UK pharmaceutical giant AstraZeneca Plc, with 76,000 employees, began negotiations to acquire Alexion.

29. AstraZeneca Plc had a pattern and practice of favoring early career employees, and of favoring development and training for younger employees.

30. AstraZeneca Plc made its first hard offer to acquire Alexion in early September

5

2020.

31. AstraZeneca sought to obtain Alexion because of Alexion's expected growth in its business based upon a robust, profitable pipeline.

32. The Boards of Directors of both companies announced the proposed acquisition on December 12, 2020, for AstraZeneca to acquire Alexion at a 45% premium on the stock price in one of the biggest deals of the year, then valued at $39 billion dollars, subject to approvals from the necessary shareholders and regulatory bodies.

33. The acquisition of Alexion was completed on July 21, 2021. With AstraZeneca accounting for the acquisition as a "business combination", Alexion Pharmaceuticals Inc. continues to operate at the same address in Boston, MA doing business as "Alexion, AstraZeneca Rare Disease."

34. By operation of law, AstraZeneca. is the successor to all the assets and liabilities of Alexion Pharmaceuticals, Inc. before the merger.

**The Restructuring of Alexion.**

35. In the course of negotiating with AstraZeneca, Alexion announced a restructuring of its Boston-based rare disease units.

36. The Alexion restructuring of 2020 recognized expected growth in its Complement and Neurology medicines

37. Through its negotiations and due diligence, Alexion knew or should have known that AstraZeneca favored retention and rehiring of an early career demographic which embodied age discrimination, and was based on stereotypic and invidious discriminatory intent.

38. The Alexion 2020 restructuring was designed by Alexion and Leese to favor a younger managerial staff, favoring retention and rehiring of an early career demographic which embodied age discrimination, and was based on stereotypic and invidious discriminatory intent.

39. On September 24, 2020, Alexion, by letter from Defendant Mary-Sheila Leese, announced a Patient Services Restructuring Disclosure, sent to Alexion's Boston-based Patient Services Organization to 85 employees. They announced that Alexion was restructuring two business areas within Patient Services, known as Neurology and Complement, by terminating employees holding all 85 positions in those units and by hiring applicants into 100 created new positions.

40. Leese notified all three related Plaintiffs Frenette, Montgomery and Zuckerman that her position at Alexion was eliminated.

41. Kathleen Frenette, Leslie Montgomery and Suzanne Zuckerman, were each field-focused case managers in Neurology or Complement, age 53 or older at the effective termination date of March 1, 2020, who were given notice of termination by Alexion by the Leese letter of September 24, 2020.

42. Alexion announced that all roles supporting the Complement and Neurology business units would be "eliminated" and replaced with allegedly new roles to support the needs of the business.

43. The relevant hiring decisions were based entirely on responses to questions during a single oral interview. Four panels were created to conduct the internal candidate interviews, and each panel was supposed to ask the same four questions of the

candidates it interviewed, despite considering them for very different jobs. Panels allegedly also posed an additional, allegedly job-specific question to candidates, but on information and belief, did so unequally.

44. Each panelist allegedly assigned a score to each candidate based on the interview, and each panel made its hiring decisions allegedly based solely on interview answers without reference to prior performance evaluations or anything else in the personnel file, or other relevant measures of job performance.

45. Alexion conducted subjective interviews, ignoring qualifications, work performance and other legitimate factors.

46. Alexion discriminated within the class of all protected persons over 40 by adversely affecting the Plaintiffs, all over 53, compared to significantly younger employees, because of their ages.

47. Alexion's ADEA disclosure revealed that in the eight positions of "field focused case manager" - all five nurses over 53, including Frenette, Montgomery and Zuckerman, were out, while the three field focused case managers 52 or under were in.

48. In the ADEA Disclosure, of the treatment of case managers,   in the roles identified as being like Frenette, Montgomery and Zuckerman, an employee was significantly more likely to be fired and not retained at age 53 or older, as were the plaintiffs, compared to other affected significantly younger case managers.

49. Using a five-year difference as a significant difference within the protected age group, it was 3.5 times more likely for a case manager to be fired and not retained at age 53 or greater than at 47 and younger.

50.  Each plaintiff was rejected for comparable positions for which they were qualified and applied, while Alexion hired individuals who were 6 -20 years younger, less experienced and less knowledgeable about Rare Diseases products and services at Alexion.

51. Defendants filled positions with managerial candidates 10-20 years younger than Ms. Frenette.

52. Defendants filled positions with managerial candidates 7 years younger than Ms. Montgomery.

53. Defendants filled positions with managerial candidates 6 years younger than Ms. Zuckerman, with known rehires aged 36, 38, 43, 46, and 48, who had lesser qualifications, less relevant work experience.

54. Frenette, Montgomery and Zuckerman were denied interviews for higher level positions including Lead PEM, Associate Director of Patient Training and Advocacy, and Senior Manager of Patient Engagement but interviews were granted to less qualified significantly younger candidates, for whom restrictions were waived or prior experience was considered. Plaintiffs were blocked by barriers not applied to younger candidates and by the failure to consider their prior qualifications and work performance.

55. The restructuring violated Alexion's known duty to maintain an environment free of age discrimination, and were conducted in a truncated and rushed procedure during the negotiations with AstraZeneca.

56. The restructuring violated Alexion's company policies which required it to consider education, experience and work skills in termination and rehiring. The interview

7

process chosen violated the EEO policy requiring consideration of qualifications, work performance and other legitimate factors. Making decisions based on one approximate 20- to 45-minute oral interview violates the EEO Policy, as qualifications and relevant work performance were omitted from consideration.

57. The terminations and rehiring in the restructuring violated Alexion's company goal and policy of minimizing the impact of that reorganization on its current employees.

58. Alexion continued the work of its previous business, i.e., the sale of the existing and emerging rare drugs, and planned to expand significantly and has done so.

59. Alexion gave Frenette, Montgomery and Zuckerman until approximately October 2, less than one week, to apply for allegedly restructured positions and to avoid terminations that would become effective in March, 2021.

60. Alexion held interviews for rehiring in the first weeks of October 2020 for any terminated employee applying for a new position under the restructuring.

61. By late October 2020 Alexion had made decisions to fill many positions.

**The Patterns and Practices of AstraZeneca and Alexion as to age, retention, rehiring and promotion.**

62. In 2020 AstraZeneca alleged that it was committed to inclusion and diversity, and planned to grow and prosper by recruiting, retaining and developing talented people.

63. In 2020 AstraZeneca reported inclusion and diversity by race and gender but not by age in its annual report.

64. In 2020 and 2021 Alexion and AstraZeneca created targeted recruitment and retention strategies, identified desired development of its employees and sought to evolve its culture to ensure retention of highly skilled personnel and to ensure succession planning.

65. In 2020 and 2021 and continuing, Alexion and AstraZeneca intentionally favored younger employees in retention, development, and succession planning. Managers.

66. In 2020, allegedly to enhance high performance, AstraZeneca removed performance rating and shifted its focus to coaching, development and contribution.

67. In 2020, AstraZeneca and Alexion discriminatorily created and prioritized programs that favored young employees such as graduate and apprentice programs and investing in internships and recruitment opportunities recognizing these programs as critical to attracting early career talent, and to insuring that they have the talent they needed in the future.

68. During 2020, AstraZeneca continued to hire, hiring over 15,500 people during the Covid pandemic.

69. AstraZeneca acknowledged that its hiring increased the number of employees with less than two years' service to 35% of its workforce, up from 20% in 2012.

70. AstraZeneca has a pattern and practice of favoring early career employees while acknowledging that retention of this population is challenging.

71. AstraZeneca sought to retain high performers through more effective hiring, exit interviews, risk assessments and retention plans, and to monitor trends in recruitment and resignation closely.

72. Alexion awarded Frenette, Montgomery and Zuckerman recognition and consideration of their achievements which it ignored in the restructuring.

73. AstraZeneca and Alexion prioritized development of Rising Talent and emerging

8

leaders over the development of mid-career women employing euphemisms, scoring and services which advanced younger managers over older managers.

74. Upon information and belief, Alexion and Defendant Leese knew about AstraZeneca's policies and practices that favored younger people, and Alexion was influenced by those policies and practices in the restructuring process.

**Kathleen Frenette**

75. Kathleen Frenette, B.S.N., age 56, who had an excellent record, had been recruited to Alexion, and recruited back at least once after she had left for a better position, applied for and was rejected from positions given to younger less qualified applicants. Ms. Frenette was extraordinarily well qualified for Patient Education Manager (PEM). She was hired by Alexion in February 2013, and she received consistent raises and bonuses as well as many awards and complimentary performance evaluations. She had an excellent work history as Field Case Manager and worked in the Neurology, Complement and Metabolic divisions.

76. With these same excellent qualifications, Ms. Frenette was also extraordinarily well qualified for her application for the PEM Lead job. Those who were hired instead of her for PEM and PEM Lead were less qualified and significantly younger.   Instead of hiring Ms. Frenette, Alexion awarded the PEM Northeast position for neurology to William Busk (age 36, 20 years younger), and the PEM Northeast Complement position to Kia Whitaker (age 43, 13 years younger), and awarded the Patient Engagement Manager (PEM) Lead position in Neurology to Cara Amos (age 38, 18 years younger); the PEM Lead in Complement to Melissa Gibson (age 46, 10 years younger).  Neither Busk nor Whitaker had other experience, including but not limited to field experience which Frenette had.

77.  Upon information and belief, other younger managers have been hired into PEM and PEM Lead positions, have been given appropriate supervision and resources, which include being mentored and cross-trained.

78.  Defendants denied Ms. Frenette's application for PEM and PEM lead positions based on a single "subjective" interview with questions which violated their own important policies and procedures, did not serve a legitimate business need, and caused younger candidates to be hired.

79. Defendants asserted inconsistent reasons for the subjective assessment and denial to Frenette of the PEM and PEM lead positions. Prior to the actual interview conducted by Defendant Leese and panel members Mike Williamson and Emily Ferguson, Defendant Leese commented to Frenette, "You certainly have the experience, Kathy."  After the interview, when Ms. Frenette asked Defendant Leese why she was not selected, Ms. Leese told her that her submission of a business plan had no bearing on the final choices but gave no further information.  However, another interviewer told Ms. Frenette, inconsistently, that a business plan she had submitted was good but "vague" and that she had scored a 3 out of 5 and the person offered "the role" scored a 4.

80. After the interviews were completed and the selections made, and before consulting counsel, Ms. Frenette complained to the ethics committee, among other things citing that her age was a factor in her non-selection. Without elaboration, after about a month elapsed Diane Bordini of Employee Relations informed her that the

9

investigators had found no violations in the manner in which the interviews were conducted.

81. The investigators overlooked or disregarded the company EEO Policy that should have guided the interviewers.

82. Defendants failed to conduct a thorough and adequate investigation, including but not limited to failing to investigate the violation of EEO policies and restructuring goals, and by considering only the scoring on the answers to interview questions.

83. Alexion's non-selection of Ms. Frenette for the above positions were decisions tainted by age bias, which was a determinative factor in her non-selection for the positions for which she inquired or applied.

**Leslie Montgomery**

84. Ms. Montgomery joined Alexion on July 9, 2018 as a registered nurse in a Field Focused Case Manager position. She supported eight Regional Account Managers and one Regional Account Director throughout the West and Pacific Northwest regions. During her tenure, she received numerous awards and met all expectations.

85. In February, 2020, Alexion selected her to represent the Nursing Patient Support services at the National Conference on Patient Advocacy, a conference with more than 800 sales and support personnel in attendance in Dallas. Ms. Montgomery was one of the only nationally Board-Certified Patient Advocates at Alexion, with extensive advocacy experience.  She made an onstage presentation and shortly thereafter received an Alexion Values Award 2020 for serving patients.

86. Ms. Montgomery applied for and was interviewed for the PEM Northwest job and the Senior Manager, Patient Engagement job. Both jobs in most relevant respects were consistent with the duties and responsibilities which Ms. Montgomery had filled during her tenure.

87. The job posting description for PEM described the job that she had performed for many years as a Board-Certified Patient Advocate, and she had been directly involved with two patient advocacy organizations, and these elements of the job posting amounted to a large majority of what the allegedly new job entailed.

88. Ms. Montgomery was surprised when on October 30 Defendant Leese personally told her she would not be offered either the PEM position nor the Senior Manager, Patient Engagement position.

89. Instead, Human Resources representative Emily Ferguson offered Ms. Montgomery only a demotion to a call center Patient Navigator role, for which she had not applied. Ms. Montgomery rejected the demotion.

90. Alexion and Leese awarded the PEM Northwest job to a candidate age 49, named Teresa James, a younger employee and in all respects substantially less qualified than Ms. Montgomery.

91. Ms. James lacked the certification and the patient advocacy organizational work that Ms. Montgomery had done. More relevant, Ms. Montgomery had replaced Ms. James in the Northwest territory, following problems between Ms. James and Oregon Health Science University, a particularly important sales account in Portland. Ms. Montgomery's work repairing and reestablishing Alexion's relationship with Oregon Health Science University had proven so successful that

the OHSU Sales Manager presented her with two awards reflecting their gratitude for the reestablished collaboration and cooperation.

92. On information and belief, the Senior Manager Patient Engagement Position remained open when Ms. Montgomery was qualified to fill it, and Alexion and Leese offered it later to a substantially younger manager with less experience,

93. The interview process for Ms. Montgomery was flawed and unfair. Ms. Montgomery had sought and obtained approved Caregiver Leave for 4 weeks beginning September 21, 2020 because her daughter had major surgery and needed 24-hour nursing support.

94. While on the Caregiver Leave, Ms. Montgomery applied for the three positions. While still on Leave on October 7 she received notice by email that her interview would be the next morning at 8:00 AM. She was not informed her that the interview was the sole determinant being used to award jobs, and it was conducted by phone while she was in her daughter's hospital room. It lasted approximately 45 minutes. Nurses had come in and out of the hospital room, beeping monitors were continually sounding and she was worried about her daughter. Despite these distractions, Ms. Montgomery thought she had performed well because of her experience and knowledge of the jobs.

95. Ms. Montgomery spoke with Defendant Leese about the denial of the two jobs, and Leese told her to talk to Mr. Moy. Mr. Moy was under the direction and control of Ms. Leese who was based in Boston.

96. Moy confirmed that the interviewing panel had not reached out to any internal colleagues nor considered performance evaluations. This violated Alexion's policy to consider such qualifications and to fulfill new roles with existing employees wherever possible.

97. Moy indicated that Montgomery did not provide sufficient detail on how she would engage in patient advocacy. The interview panel members knew or should have known that Ms. Montgomery was selected in February 2020 to speak at the National Conference on Patient Advocacy. Each interview was restricted to the same four questions. Not only did the panel fail to obtain recommendations or performance evaluations, the interviewers ignored that Ms. Montgomery could fill that role as she was one of the only Board-Certified Patient Advocates at Alexion, with extensive advocacy experience.

98. Defendants denied Ms. Montgomery's application for a PEM position based on a "subjective" interview with questions which violated their own important policies and procedures, did not serve a legitimate business need, and caused younger candidates to be hired.

99. After the interviews were completed and the selections made and before consulting counsel, on November 5, 2020 Ms. Montgomery filed an internal complaint with Emily Ferguson (HR), Dan Hewitt (HR Compliance Lead) and Dianne Bordini (Employee Relations Investigator). If an investigation actually took place, none of her colleagues were interviewed. Ms. Montgomery spoke with Ms. Ferguson about a week later, who gave her no reasons for her non-selection and informed her that no age discrimination had been substantiated.

100.    Defendants failed to conduct a thorough and adequate investigation, including but not limited to failing to investigate the violation of EEO policies and

11

restructuring goals, and by considering only the scoring on the answers to interview questions.

101.    Alexion's non-selection of Ms. Montgomery for the above positions was tainted by age bias, which was a determinative factor in her non-selection for the jobs for which she applied.

**Suzanne Zuckerman**

102.    Ms. Zuckerman began work with Alexion in May 2014 as a Nurse Case Manager, working first in Complement and when the Neurology division was created, she was hired through a multi-interview process to move to the new division. Once there, she was selected to become a Focus Case Manager with added responsibilities to help bring the new division up to speed. Ms. Zuckerman consistently met or exceeded expectations on her annual reviews, in that position and received several awards. She retained that position through August 2018.

103.    In August 2018, Alexion also selected Ms. Zuckerman through another multi-interview hiring process to take one of only two Field Based Patient Services Nurse Case Manager pilot positions filled by existing Alexion employees. This position was represented to her as a pilot program with duties virtually identical to what became the PEM position. Ms. Zuckerman relocated to California to take this new position.

104.    When Alexion expanded the Field Based Patient Services Nurse Case Manager role, in about December 2018 new hires were sent to San Diego to train under Zuckerman in how to perform the Field Based role, and she was sent repeatedly to new hires' territories throughout the country as a trainer to present with them at their first visits to physician offices and patient-facing events.

105.    Consistent with the development and mentoring program applied to younger managers by AstraZeneca and or Alexion, for a brief period the employer asked her to improve her performance in completing work on schedule. Not only did she do so, but she addressed the issues earlier than expected by May 2020.  Thereafter Alexion essentially doubled Ms. Zuckerman's work by assigning her work of another Case Manager who was out on leave.  In recognition of her productivity and skill, on about September 23, 2020, Alexion gave Ms. Zuckerman an award for diligence and bringing the assignment up to date and asked her to mentor that Case Manager upon her return to work.

106.    The very next day it notified her that her position was to be "eliminated.". On or after terminating Ms. Zuckerman on September 24, 2020, Ms. Zuckerman applied for several PEM positions on or about October 2, 2020.

107.    Before working with Alexion Ms. Zuckerman had a 20-year nursing career, serving also as an educator and Director of Staff Development. With Alexion she was a frequent trainer and mentor in both the Complement and Neurology groups and one of only four case managers trained in another disease as a backup.

108.    Well before January 2020, Alexion had retained and advanced Jessica Mahoney age 39 in Complement, to be a Team Resource Lead although Ms. Zuckerman was better qualified with had prior training experience, prior Complement experience and was in good standing at the time.

109.    Ms. Zuckerman, age 53, applied for a PEM position in Complement, West division and Neurology, Southwest division.

110.    Ms. Zuckerman was well qualified to apply for the Complement West PEM job and the Neurology Southwest PEM job and was interviewed for both.

111.    The PEM Complement West and Neurology Southwest positions remained open through at least early January 2021, although Ms. Zuckerman was qualified to fill them.

112.    Zuckerman, who had prior Training experience, also sought to apply for the Associate Director Patient Services Training and Development position, but Alexion denied her an interview and granted the position, on the basis of age, to the less qualified and significantly younger Danielle McCarthy.

113.    Alexion manipulated the job requirements and conducted a sham selection procedure in an effort to conceal the age discriminatory selection. Danielle McCarthy was an Alexion employee who cheated by already knowing the questions that would be asked by the interview panel, and unfairly sharing those questions with other younger employee applicants. McCarthy should have been disciplined, perhaps fired, but not rewarded and promoted.

114.    Ms. Zuckerman's interview lasted only 20 minutes.

115.    Following the interview, Ms. Zuckerman was offered a Patient Navigator position – a significant demotion that would have also resulted in reductions to her stock and, bonuses. \The PEM Complement West and Neurology Southwest positions were filled only after internal complaints had been made that the initial interviews and selections were infected with age discrimination.

116.    On information and belief, the PEM Complement West division position was filled by a person aged 47, Mandra De Palmo, six years younger. The Neurology Southwest position was not filled by an internal candidate. Zuckerman was denied the position despite being qualified and having been interviewed for it. Alexion did not use the oral interview process to fill that position with an outside candidate.

117.    Ms. Zuckerman also complained internally that the content of her 20-minute interview was biased on the basis of age and that she knew younger employees had been coached with the questions in advance. She received no indication of why her complaint was rejected.

118.    Defendants failed to conduct a thorough and adequate investigation, including but not limited to failing to investigate the violation of EEO policies and restructuring goals, and by considering only the scoring on the answers to interview questions.

119. Age was a determinative factor in Alexion's non-selection of Ms. Zuckerman for the jobs for which she had applied.

**Other Comparable Age Discrimination Complaints And Policy Violations**

120. Upon information and belief, Kathleen Vollmer, age 53, applied for approximately 7 positions based on her qualifications. She was rejected from all, and offered only a demotion to a job as Patient Liaison. She had both greater seniority and a higher position than the much younger person, MacKenzie McConville (age 31), who was awarded a position that now has her directly supervising Ms. Vollmer.

121. Upon information and belief, Cathy Callahan, age 60, filed an internal complaint that included her claim that she was not selected because of her age.

122. Upon information and belief, Kimberly Chiarella, approximately age 60 with more than 10 years' experience as a Case Manager was not selected for a similar job. She was offered a demotion to Grade 7 Navigator and reports to a much younger employee.

123. Upon information and belief, Donna Nolan, age 59, applied for the PEM Northeast positions as did Frenette, age 56, and was rejected. Those positions were filled by William Busk (age 36) and Kia Whitaker (age 43). Both candidates 53 or over were rejected while both successful candidates were at least ten years younger.

124. Upon information and belief, some or all the above applicants complained to Human Resources and alleged that they were not selected because of their age. Without any explanation, Alexion's representatives claimed that their internal investigations revealed no unfairness or discrimination but refused to divulge any further information about the investigations or the processes they used. On information and belief Alexion did no investigation or did negligent investigations and knew or should have known that age discrimination was occurring.

125. Unequal application of criteria for hiring discriminated on the basis of age. Plaintiffs were interested in and could have applied for other PEM positions that remained unfilled. All were, however, verbally informed that an employee could not apply unless the employee lived in a "territory" which would be covered by the new position.

126. This information was false and pretextual. Upon information and belief, younger employees were hired into such positions by ignoring or relaxing the territory criteria, including but not limited to the awarding to 33-year-old Megan Miller of the mid-Atlantic PEM position although she lived in New Haven, Connecticut, and had been previously written up for misconduct at an Alexion function.

127. Alexion's Patient Services Transformation Q & A that it used to explain the reorganization was false and pretextual. It contradicted the limitation that one would be required to live in a state covered by the new position. Instead, travel was expected recognizing that states are of substantially different sizes. Q & A 16 states: "The Patient Education Manager role will require the ability to travel up to 80% within the territory."

128. In 2020 to the present Plaintiffs observed that Alexion continued a pattern of toleration of verbal abuse, directed at older case managers, the passing over for promotion of older case managers, the assignment of unreasonable caseloads directed at older case managers, all causing lack of retention and advancement for older case managers, conduct of which Alexion knew or should have known due to complaints filed, monitoring by exit interviews and other data.

129. Contrary to the Alexion commitment to retain highly skilled employees wherever possible, after the terminations announced on September 24, 2020, Alexion left many PEM and PEM lead positions open, when Frenette, Montgomery and Zuckerman, the three highly skilled case managers had applied for and could have filled such positions.

130. Alexion further discriminated against all three Plaintiffs by failing to comply with the Alexion nondiscrimination policy which was implied into the employment

contract of each.

**Causation**

131. In each of Alexion's decisions not to offer one or more of the positions to Frenette, Montgomery or Zuckerman, for which they had applied, or sought to apply, age was a determinative factor, and but for the Defendants' discriminatory animus tainted by unlawful bias each would have been retained in a position for which each had applied.

132. In each of the discriminatory practices alleged above, Leese played a significant role in participating directly, exercising management or control over the decision makers, and Leese knew or should have known that age was a determinative factor, and but for the Defendants' discriminatory animus tainted by unlawful bias, each would have been retained in a position for which each had applied.

133. As a direct and proximate result of each of the discriminatory actions above, each Defendant caused Frenette, Montgomery and Zuckerman to suffer past and probable future economic loss, fringe benefits, lost stock options and/or qualification for restricted stock, and emotional distress and loss of quality of life and life's enjoyments due to the discrimination against them.

134. Frenette, Montgomery and Zuckerman each complained of denial of positions, positions remained open for which they were qualified, and each was not hired into open positions in retaliation for their complaints of age discrimination.

135. Leese and Alexion later hired into open positions individuals who had not complained of discrimination while Plaintiffs were qualified and seeking such positions, reinstating the use of qualifications and experience criteria which had been ignored for the Plaintiffs.

136. By the conduct alleged above, Leese, and Alexion each interfered with the rights of Frenette, Montgomery and Zuckerman to be free of age discrimination and retaliation.

137. Leese and Alexion each knew that age discrimination was unlawful, and maintained policies to forbid it; the conduct of each was in reckless disregard of the obligation not to discriminate on the basis of good faith complaints of age discrimination

138. Leese and Alexion each knew that retaliation was unlawful, and maintained policies to forbid it; the conduct of each was in reckless disregard of the obligation not to retaliate on the basis of good faith complaints of age discrimination.

139. Leese and Alexion were persons who interfered with the rights of Frenette, Montgomery and Zuckerman to be employed free of age discrimination, knowingly and with outrageous and or reckless disregard of its duty not to so interfere.

**COUNT 1  --AGE DISCRIMINATION**

140. Plaintiffs incorporate all the above allegations in this Count 1.

141. Defendant Alexion is liable as the covered employer and successor employer of Frenette, Montgomery, and Zuckerman.

142. Plaintiffs are members in a protected class, as each were individuals age 53 and above at the effective date of their terminations.

143. Each Plaintiff was qualified for the positions for which each applied and as interviewed and not selected.

144. Plaintiffs have each suffered adverse employment actions of discharge and failure to be retained in employment and failure to be rehired because of their age. The adverse actions occurred under circumstances that create an inference that a discriminatory animus based on each Plaintiff's age caused the termination and failure to rehire.

145. Each Plaintiff suffered harm as a result of the adverse actions, including economic harm, including back and front pay, emotional distress, loss of enjoyment of life, opportunity costs due to the loss of income at the time, and foreseeable harm due to the loss of income at a time of other obligations and have incurred attorneys' fees, costs and loss of interest.

146. Defendants committed the adverse acts knowing, or with reason to know, that they constituted age discrimination, and in reckless disregard of Alexion's policy that it must not discriminate on the basis of age, and the Plaintiffs seek double and up to triple damages on this count of Discrimination as the adverse actions warrant multiple damages.

**COUNT 2--DISCRIMINATION and INTERFERENCE BY INDIVIDUAL DEFENDANT LEESE UNDER 4(4) AND 4(4)(A)**

147. Plaintiffs incorporate all the above allegations in this Count 2.

148. By her determinative role in planning, implementing or overseeing the acts alleged above, Leese interfered with each Plaintiff in the exercise or enjoyment of any right granted or protected by this chapter," G. L. c. 151B, § 4 (4A), to be free of discrimination and retaliation.

149. As a direct and proximate cause of such interference and retaliation, Frenette Montgomery, and Zuckerman suffered adverse actions alleged above including termination, failure to be offered development opportunities, failure to be retained, failure to be rehired, and terms and conditions of employment favoring younger managers.

150. As a direct and proximate cause of such interference and retaliation by Leese, Frenette, Montgomery and Zuckerman suffered harm as a result of the adverse actions, including economic harm, including back and front pay, emotional distress, loss of enjoyment of life, opportunity costs due to the loss of income at the time, foreseeable harm due to the loss of income at a time of other obligations, and have incurred attorneys' fees, costs and loss of interest.

**COUNT 3--RETALIATION BY DEFENDANT ALEXION AFTER COMPLAINT OF DISCRIMINATION UNDER  151 B §4 and 4(4A)**

151. Frenette, Montgomery and Zuckerman incorporate all the above allegations in this Count 3.

152. Each Plaintiff complained in good faith of their belief that age discrimination had occurred.

153. Defendant interfered with the right of Frenette, Montgomery and Zuckerman to be

free of age discrimination by the conduct alleged above and by failing to thoroughly investigate, remedy and deter a work environment discriminatory on the basis of age of which it had notice and which continued after and because of that protected conduct.

154. As a direct result of the interference and retaliation of Alexion each Plaintiff has suffered the adverse actions alleged above.

155. As a direct and proximate cause of such interference and retaliation by Alexion, Frenette, Montgomery and Zuckerman suffered harm as a result of the adverse action, including economic harm,  including front and back pay, emotional distress, loss of enjoyment of life, opportunity costs due to the loss of income at the time, foreseeable harm due to the loss of income at a time of other obligations, and have incurred attorneys' fees, costs and loss of interest.

156. Plaintiffs also seek punitive damages on this count because the adverse actions taken with retaliatory purpose were outrageous and egregious and in reckless disregard of Alexion's policy that it must not retaliate on the basis of protected activity and were knowing violations of 151B §4(4) and 4(4A), warranting punitive damages.

**WHEREFORE**, the Plaintiffs ask that this Court:

1. A JURY TRIAL IS DEMANDED.

2. Take jurisdiction of this case;

3. Award damages for past and probable future economic loss, fringe benefits, stock options and/or qualification for restricted stock, and emotional distress and loss of quality of life and life's enjoyments;

4. Award attorney's fees, interest and costs;

5. Award triple damages and/or punitive damages;

6. Award such other and further relief as may be just and equitable.

**Respectfully submitted,**

**COUNSEL FOR PLAINTIFFS,**

_Elizabeth A Rodgers_

Elizabeth A. Rodgers BBO #424360

**GORDON LAW GROUP LLP**

17

585 Boylston Street
Boston MA  02116
Tel: 617-536-1800 | Fax: 617-536-1802
Home Office: 857-928-4033
E-mail:  erodgers@gordonllp.com

/s/ Philip Gordon

_____
Philip J. Gordon BBO # 1142934
Gordon Law Group LLP

585 Boylston Street
Boston MA  02116
Tel: 617-536-1800 | Fax: 617-536-1802
Home Office: 857-928-4033
E-mail:  pgordon@gordonllp.com

/s/Joseph D. Garrison

_____
Joseph D. Garrison *(CT Juris # 021832)*
GARRISON, LEVIN-EPSTEIN,
    FITZGERALD & PIRROTTI, P.C.
405 Orange Street
New Haven, CT  06511
Tel.: 203-777-4425 | Fax: 203-776-3965
E-mail:  jgarrison@garrisonlaw.com

18



| AMENDED<br>**CIVIL ACTION COVER SHEET** | DOCKET NUMBER<br>2284CV01269-C | **Trial Court of Massachusetts**<br>**The Superior Court** | 3 |
|---|---|---|---|

**COUNTY**

| Plaintiff | Kathleen Frenette | Defendant: | Alexion Pharmaceuticals, Inc. now D/B/A Alexion, |
|---|---|---|---|
| ADDRESS: | 10 Baxter Court | | AstraZeneca Rare Disease |
| Cheshire, CT 06410 | | ADDRESS: | 121 Seaport Boulevard |
| Kathleen.frenette@gmail.com; (203) 535-6725 | | Boston, MA 02210 | |
| Plaintiff: | Leslie Montgomery | Defendant: | Mary Sheila Leese |
| ADDRESS: | 10184 Thunder Run | ADDRESS: | 28 Byfield Road, Waban, MA 02468 |
| Littleton, CO 80125 | | | |
| leslieamontgomery@msn.com | (720) 383-8316 | | |
| | | | |
| Plaintiff: | Suzanne Zuckerman | Defendant Attorney: | Lynn A. Kappelman, Esq. |
| ADDRESS: | 2742 Ariane Drive, Unit 157 | ADDRESS: | Seyfarth Shaw LLP |
| San Diego, CA 92117 | | Two Seaport Lane, Suite 1200 | |
| suezrider118@gmail.com | .(203) 417 4214 | Boston, MA 02210   Lkappelman@seyfarth.com; 1-617-946-4888 | |
| | | BBO: | 642017 |
| Plaintiff Attorney: | Elizabeth Rodgers, Esq. | Defendant Attorney: | Emily J. Miller |
| ADDRESS: | Gordon Law Group, LLP | ADDRESS: | Seyfarth Shaw LLP |
| 585 Boylston Street | | Two Seaport Lane, Suite 1200 | |
| Boston, MA 02116   erodgers@gordonllp.com; 617 536-1800 | | Boston, MA 02210   EmMiller@seyfarth.com;   1-617-946-8322 | |
| BBO: | 424360 | BBO:<br>705662 | |
| Plaintiff Attorney: | Joseph Garrison, Esq. | Plaintiff Attorney: | Philip Gordon |
| ADDRESS: | Garrison, Levin-Epstein, Fitzgerald & Pirrotti, P.C. | ADDRESS: | Gordon Law Group LLP |
| 405 Orange Street | | 585 Boylston Street, Boston MA 02116 | |
| New Haven, CT 06511   JGarrison@garrisonlaw.com ;   203 777 4425 | | pgordon@gordonllp.com; 617 536 1800 | |
| BBO: | 021832 | BBO: #630989 | |

### TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)

| CODE NO.<br>B22 | TYPE OF ACTION (specify)<br>Employment Discrimination | TRACK<br>F | HAS A JURY CLAIM BEEN MADE?<br>☑ YES     ☐ NO |
|---|---|---|---|

*If "Other" please describe: _____

| **Is there a claim under G.L. c. 93A?** | **Is there a class action under Mass. R. Civ. P. 23?** |
|---|---|
| ☐ YES     ☑ NO | ☐ YES     ☑ NO |

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS

A. Documented medical expenses to date

    1. Total hospital expenses _____

    2. Total doctor expenses _____

    3. Total chiropractic expenses _____

    4. Total physical therapy expenses _____

    5. Total other expenses (describe below) _____

    _____

                                              Subtotal (1-5): _____ **$0.00**

B. Documented lost wages and compensation to date _____

C. Documented property damages to date _____

D. Reasonably anticipated future medical and hospital expenses _____

E. Reasonably anticipated lost wages _____

F. Other documented items of damages (describe below) _____

    Plaintiffs' damages exceed $50,000.00.

                                              TOTAL (A-F): _____ **over $50,000**

Date Filed 6/9/2022 4:36 PM
Superior Court - Suffolk
Docket Number 2284CV01269

3. What is the plaintiff's injury, including the nature and extent of injury.

> Three Plaintiffs  aged 53 and older were terminated and younger applicants were rehired into positions for which they applied and were qualified, resulting in lost managerial wages, back pay, front pay, and other economic damages, along with emotional distress, attorneys fees.

### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|--------|-----------------------------------|--------|
| 1. | | |
| | Total | |

Signature of Attorney/Unrepresented Plaintiff: X _/s/ Elizabeth A Rodgers_     Date: _June 6, 2022_

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney/Unrepresented Plaintiff: X _/s/ Elizabeth A Rodgers_     Date: _June 6, 2022_

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

**AC Actions Involving the State/Municipality ***

| | |
|---|---|
| AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. | (A) |
| AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. | (A) |

**CN Contract/Business Cases**

| | |
|---|---|
| A01 Services, Labor, and Materials | (F) |
| A02 Goods Sold and Delivered | (F) |
| A03 Commercial Paper | (F) |
| A04 Employment Contract | (F) |
| A05 Consumer Revolving Credit - M.R.C.P. 8.1 | (F) |
| A06 Insurance Contract | (F) |
| A08 Sale or Lease of Real Estate | (F) |
| A12 Construction Dispute | (A) |
| A14 Interpleader | (F) |
| BA1 Governance, Conduct, Internal Affairs of Entities | (A) |
| BA3 Liability of Shareholders, Directors, Officers, Partners, etc. | (A) |
| BB1 Shareholder Derivative | (A) |
| BB2 Securities Transactions | (A) |
| BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. | (A) |
| BD1 Intellectual Property | (A) |
| BD2 Proprietary Information or Trade Secrets | (A) |
| BG1 Financial Institutions/Funds | (A) |
| BH1 Violation of Antitrust or Trade Regulation Laws | (A) |
| A99 Other Contract/Business Action - Specify | (F) |

\* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

† Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

| | |
|---|---|
| D01 Specific Performance of a Contract | (A) |
| D02 Reach and Apply | (F) |
| D03 Injunction | (F) |
| D04 Reform/ Cancel Instrument | (F) |
| D05 Equitable Replevin | (F) |
| D06 Contribution or Indemnification | (F) |
| D07 Imposition of a Trust | (A) |
| D08 Minority Shareholder's Suit | (A) |
| D09 Interference in Contractual Relationship | (F) |
| D10 Accounting | (A) |
| D11 Enforcement of Restrictive Covenant | (F) |
| D12 Dissolution of a Partnership | (F) |
| D13 Declaratory Judgment, G.L. c. 231A | (A) |
| D14 Dissolution of a Corporation | (F) |
| D99 Other Equity Action | (F) |

**PA Civil Actions Involving Incarcerated Party †**

| | |
|---|---|
| PA1 Contract Action involving an Incarcerated Party | (A) |
| PB1 Tortious Action involving an Incarcerated Party | (A) |
| PC1 Real Property Action involving an Incarcerated Party | (F) |
| PD1 Equity Action involving an Incarcerated Party | (F) |
| PE1 Administrative Action involving an Incarcerated Party | (F) |

**TR Torts**

| | |
|---|---|
| B03 Motor Vehicle Negligence - Personal Injury/Property Damage | (F) |
| B04 Other Negligence - Personal Injury/Property Damage | (F) |
| B05 Products Liability | (A) |
| B06 Malpractice - Medical | (A) |
| B07 Malpractice - Other | (A) |
| B08 Wrongful Death - Non-medical | (A) |
| B15 Defamation | (A) |
| B19 Asbestos | (A) |
| B20 Personal Injury - Slip & Fall | (F) |
| B21 Environmental | (F) |
| B22 Employment Discrimination | (F) |
| BE1 Fraud, Business Torts, etc. | (A) |
| B99 Other Tortious Action | (F) |

**RP Summary Process (Real Property)**

| | |
|---|---|
| S01 Summary Process - Residential | (X) |
| S02 Summary Process - Commercial/ Non-residential | (F) |

**RP Real Property**

| | |
|---|---|
| C01 Land Taking | (F) |
| C02 Zoning Appeal, G.L. c. 40A | (F) |
| C03 Dispute Concerning Title | (F) |
| C04 Foreclosure of a Mortgage | (X) |
| C05 Condominium Lien & Charges | (X) |
| C99 Other Real Property Action | (F) |

**MC Miscellaneous Civil Actions**

| | |
|---|---|
| E18 Foreign Discovery Proceeding | (X) |
| E97 Prisoner Habeas Corpus | (X) |
| E22 Lottery Assignment, G.L. c. 10, § 28 | (X) |

**AB Abuse/Harassment Prevention**

| | |
|---|---|
| E15 Abuse Prevention Petition, G.L. c. 209A | (X) |
| E21 Protection from Harassment, G.L. c. 258E | (X) |

**AA Administrative Civil Actions**

| | |
|---|---|
| E02 Appeal from Administrative Agency, G.L. c. 30A | (X) |
| E03 Certiorari Action, G.L. c. 249, § 4 | (X) |
| E05 Confirmation of Arbitration Awards | (X) |
| E06 Mass Antitrust Act, G.L. c. 93, § 9 | (A) |
| E07 Mass Antitrust Act, G.L. c. 93, § 8 | (X) |
| E08 Appointment of a Receiver | (X) |
| E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A | (A) |
| E10 Summary Process Appeal | (X) |
| E11 Worker's Compensation | (X) |
| E16 Auto Surcharge Appeal | (X) |
| E17 Civil Rights Act, G.L. c.12, § 11H | (A) |
| E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) | (X) |
| E25 Pleural Registry (Asbestos cases) | |
| E94 Forfeiture, G.L. c. 265, § 56 | (X) |
| E95 Forfeiture, G.L. c. 94C, § 47 | (F) |
| E99 Other Administrative Action | (X) |
| Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B | (F) |
| Z02 Appeal Bond Denial | (X) |

**SO Sex Offender Review**

| | |
|---|---|
| E12 SDP Commitment, G.L. c. 123A, § 12 | (X) |
| E14 SDP Petition, G.L. c. 123A, § 9(b) | (X) |

**RC Restricted Civil Actions**

| | |
|---|---|
| E19 Sex Offender Registry, G.L. c. 6, § 178M | (X) |
| E27 Minor Seeking Consent, G.L. c.112, § 12S | (X) |

### TRANSFER YOUR SELECTION TO THE FACE SHEET

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES   ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF -** The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT -** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY MAY RESULT IN DISMISSAL OF THIS ACTION.

| **Summons** | CIVIL DOCKET NO.<br>2284CV1269C | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

CASE NAME:
Kathleen Frenette, Leslie Montgomery and Suzanne Zuckerman
Plaintiff(s)

vs.

Alexion Pharmaceuticals, Inc., now D/B/A Alexion, AstraZeneca Rare Disease, and Mary Sheila Leese,
Defendant(s)

Michael Joseph Donovan — Clerk of Courts
Suffolk — County

COURT NAME & ADDRESS:
SUPERIOR CIVIL COURT
SUFFOLK COUNTY COURTHOUSE
THREE PEMBERTON SQ. 12th Floor
BOSTON, MASSACHUSETTS 02108

THIS SUMMONS IS DIRECTED TO Alexion Pharmaceuticals, Inc. (Defendant's name) now D/b/A as Alexion Astrazeneca Rare Disease

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Suffolk Superior Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**
If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**
To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
  a) Filing your **signed original** response with the Clerk's Office for Civil Business, Suffolk Superior Court 3 Pemberton Sq, Boston MA 02108 (address), by mail or in person **AND** 12th Floor,
  b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Elizabeth A. Rodgers, Gordon Law Group LLP 585 Boylston St., Boston, MA 02116

3. **What to Include in Your Response.**
An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury. you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings:**

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger _____ , Chief Justice on _____ , 20 ____ . (Seal)

Clerk-Magistrate _Michael Joseph Donovan_
             Michael Joseph Donovan

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

### PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ . I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated: _____          Signature: _____

**N.B.   TO PROCESS SERVER:**

        **PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) | DOCKET NUMBER 2284CV01269 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Kathleen Frenette et al vs. Alexion Pharmaceuticals Inc d/b/a Alexion AstraZeneca Rare Disease et al | Michael Joseph Donovan, Clerk of Court |
|---|---|

| TO: | COURT NAME & ADDRESS Suffolk County Superior Court - Civil Suffolk County Courthouse, 12th Floor Three Pemberton Square Boston, MA 02108 |
|---|---|

## TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION             DEADLINE

|  | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court |  | 09/06/2022 |  |
| Response to the complaint filed (also see MRCP 12) |  | 10/06/2022 |  |
| All motions under MRCP 12, 19, and 20 | 10/06/2022 | 11/07/2022 | 12/05/2022 |
| All motions under MRCP 15 | 10/06/2022 | 11/07/2022 | 12/05/2022 |
| All discovery requests **and depositions** served and non-expert depositions completed | 04/04/2023 |  |  |
| All motions under MRCP 56 | 05/04/2023 | 06/05/2023 |  |
| Final pre-trial conference held and/or firm trial date set |  |  | 10/02/2023 |
| Case shall be resolved and judgment shall issue by |  |  | 06/07/2024 |

The final pre-trial deadline is <u>not the scheduled date of the conference</u>. You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED 06/08/2022 | ASSISTANT CLERK Paul Kenneally | PHONE (617)788-8172 |
|---|---|---|

Date/Time Printed: 06-08-2022 15:07:18

SCV026, 08/2018