UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Kathleen Frenette, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:22-cv-11042-IT |
| | * | |
| Alexion Pharmaceuticals Inc., | * | |
| | * | |
| Defendant. | * | |
| | * | |

MEMORANDUM & ORDER

March 20, 2026

TALWANI, D.J.

In this employment dispute, Plaintiffs Kathleen Frenette, Leslie Anne Montgomery, and Suzanne Zuckerman assert claims against Defendants Alexion Pharmaceuticals, Inc. ("Alexion") for age discrimination and retaliation. Plaintiffs assert that, in a 2020 restructuring resulting in additional jobs, Alexion used a "ruse" of terminating case managers and requiring them to re-apply through a process based solely on subjective interviews, resulting in disparate treatment of Plaintiffs based on their age. Compl. 1 [Doc. No. 1-1]. Now pending before the court is Alexion's Motion for Summary Judgment [Doc. 90].[1] For the reasons set forth herein, the Motion is GRANTED as to Plaintiffs' retaliation claim and DENIED as to their discrimination claim.

I.    **Background**

A. **The Parties**

Alexion is a biopharmaceutical company based in Boston, Massachusetts. See Notice of Removal ¶ 12 [Doc. No. 1]. Alexion develops drug therapies for patients with "rare diseases[.]"

---

[1] The court previously granted the motion as unopposed as to Defendant Mary-Sheila Leese. See Elec. Order [Doc. No. 116] (dismissing Count 2); Pls.' Opp'n 18 [Doc. No. 97].

1

See Defs.' Statement of Facts ¶ 1 ("Defs.' SOF") [Doc. No. 92]. Alexion's Patient Services Organization (formerly called "OneSource") provided patient support in connection with these therapies. Id.

At the time of the actions challenged here, Frenette, Montgomery, and Zuckerman all worked in the OneSource Neurology Group as Field Focused Case Managers. Frenette was 56 years old, Montgomery was 55 years old, and Zuckerman was 52 years old. Id. ¶¶ 62, 83, 98. Frenette had worked at OneSource since February 2013 (except for a few months in 2015 when she worked for a company that was then acquired by Alexion), Zuckerman since May 2014, and Montgomery since June 2015. Id. ¶¶ 54–57, 72, 91–92. Alexion categorized positions by numerical level, corresponding to duties and salary, and categorized Case Managers, including Field Focused Case Managers, as Level 8 positions. See Defs.' SOF Ex. 1, ¶ 18 ("Leese Decl.") [Doc. No. 92-1].

### B. Alexion's Restructuring of OneSource

On September 24, 2020, Alexion announced a "restructuring" of OneSource to accommodate anticipated growth. Id. ¶¶ 10–12. As part of the restructuring, the company renamed "OneSource" as "Patient Services" and designed a new organizational configuration for the department. Id. The restructuring announcement informed employees that 86 positions, including all Case Managers in Neurology, would be eliminated as of March 1, 2021. Def.'s SOF Ex. 5, at ECF 7–8 ("Reorg. PowerPoint") [Doc. 92-5]; Leese Decl. ¶ 12 [Doc. No. 92-1].

The company also announced 101 new positions and encouraged the affected employees to apply for the new positions. See Leese Decl. ¶ 17 [Doc. No. 92]; Pls.' Opp'n Ex. 15, at ECF 7 ("Reorg. FAQ") [Doc. No. 96-15]; Reorg. PowerPoint at ECF 7–8 [Doc. 92-5]. Alexion stated it

would inform affected employees whether they would be hired in a new role in Patient Services by the end of October 2020. See Reorg. PowerPoint at ECF 8 [Doc. No. 92-5].

On September 30, 2020, the new Patient Services job postings went live on Alexion's website and employees were told to apply "to any role" in which they were interested by October 2, 2020. Reorg. FAQ at ECF 7 [Doc. No. 96-15]; see Reorg. PowerPoint at ECF 9 [Doc. 92-5]; Def.'s SOF Ex. 19 ("Ferguson and Montgomery Emails") [Doc. No. 92-19]. After the positions were posted, managers reached out to affected employees to meet and discuss the new roles and application process. See Reorg. FAQ at ECF 7 [Doc. No. 96-15]. During the initial hiring process in October 2020, Alexion only reviewed internal candidates. See Leese Decl. ¶ 27 [Doc. No. 92-1].

Among the new roles in Patient Services were two Level 7 positions: Patient Navigator and Patient Liaison. Id. ¶¶ 19–20 [Doc. No. 92-1]. Employees selected for these lower level positions would have a "grandfathered" base salary that matched their Level 8 positions, but with bonus and equity targets lowered, and only a one-time bonus in March 2022 in lieu of the lost bonus and equity potential. See Reorg. FAQ at ECF 8 [Doc. No. 96-15]. Further, unlike Plaintiffs' roles, the new lower level positions did not require significant travel and Alexion would not provide a car allowance after June 2021. Id. Additional new positions included: Patient Education Manager ("PEM"), categorized as Level 9, see Leese Decl. ¶ 21 [Doc. No. 92-1]; Senior Manager for Patient Engagement, also categorized as Level 9, see Defs.' SOF Ex. 10, at ECF 2 [Doc. No. 92-10][2]; and PEM Lead, categorized as Level 11, see Defs.' SOF Ex. 9, at ECF 2 [Doc. No. 92-9].

---

[2] Defendants assert both that this position was a level 10, see Leese Decl. ¶ 21 [Doc. No. 92-1], and that it was a level 9 position, see Defs.' SOF ¶ 34 [Doc. No. 92].

Following the restructuring from OneSource to Patient Services, no Level 8 positions remained within the department. See Leese Decl. ¶ 18 [Doc. No. 92-1].

On October 6, 2020, Alexion hosted a "culture call" meeting, see Defs.' Reply Ex. A [Doc. No. 100-1], during which it explained the interview process and referenced the "Interview Guide," a resource "designed to help [the hiring panel] conduct behavior-based interviews to gain insight into the candidate's past behavior and performance[.]" Pls.' Opp'n Ex. 43, at ECF 5 [Doc. No. 96-43].

The company appointed four different panels, each "comprised of a mix of . . . management . . . and human resources personnel" to conduct a single interview of each employee. Leese Decl. ¶¶ 29–32 [Doc. No. 92-1]. The single-interview process was designed with the panels "pos[ing] four core questions to each applicant followed by a single, role-specific question for each position that the applicant sought." Id. ¶ 29 "The four core questions . . . were designed to evaluate the applicant across the following areas: (1) Strategic Thinking; (2) Culture; (3) Matrix Leadership; and (4) External Orientation. . . . The role-specific questions were designed to allow candidates to showcase their applicable skills and experiences for the particular roles at issue." Id. ¶¶ 33–34. The different panels did not pose the same questions to each applicant for a specific role. Instead, Alexion's People & Culture Partner Emily Ferguson reminded each of the panelists that "the questions [were] different for each panel[.]" Pls.' Opp'n Ex. 20, at ECF 2 [Doc. No. 96-20].

Starting on October 8, 2020, the panels interviewed the employees who applied to new roles. Leese Decl. ¶ 29 [Doc. No. 92-1].[3] Each panelist scored the interviewee on a scale from 1–5

---

[3] Only three of the four panels (designated Panels B, C, and D) conducted interviews of the candidates who applied for the positions at issue here. See Defs.' SOF Ex. 16 ("Interview

for each question; the scores were then averaged. See id. Accordingly, for each role an employee interviewed for, the panel could assign a maximum of 25 points. See id. ¶ 30. Put another way, the panel assigned each interviewee a baseline score of 4–20, based on the core questions, and assigned an additional 1–5 points based on the question regarding the specific role. See id.[4]

### C. Frenette's Application Process

Frenette applied to four positions, detailed further below. Frenette met with Liam Moy, the Senior Director of Neurology for Patient Services and the head of Plaintiffs' department, prior to Frenette's interview. Pls.' Opp'n Ex. 1, ¶ 11 [Doc. No. 96-1] (Frenette Aff.).

Frenette was interviewed for all four positions by a single panel on October 8, 2020. See Defs.' SOF ¶¶ 59–61 [Doc. No. 92].

Regarding her interview performance, one of the panelists, Executive Director of Patient Engagement and Strategy Mary-Sheila Leese, wrote in an email to the other panelists: "[Frenette] said some questionable things [regarding compliance.]" Defs.' SOF Ex. 17, at 2 [Doc. No. 92-17]. Leese described being "concerned [Frenette] doesn't have the needed organizational maturity and savvy for PEM Lead[.]" Id. Leese also criticized the content of Frenette's "30-60-90 day plan [of action for the position]," stating it "could have been more succinct, clear[.]" Id.

Leese informed Frenette on October 30, 2020, that she had not been hired for any of the four roles to which she applied. Defs.' SOF Ex. 6, at 122–23 ("Frenette Depo.") [Doc. No. 92-6]. Another panelist, Senior Director of Complement for Patient Services Mike Williamson, spoke with Frenette that same day to offer her feedback on her interview. Id. at 123–24.

---

Scoring") [Doc. 92-39]. The scores of candidates interviewed by Panel A are not part of the record.

[4] The specific scores received by each of the Plaintiffs and by the individuals selected for the positions are discussed in Section III, below.

The positions to which Frenette applied were all filled by younger internal applicants who received higher scores in their interviews. See Interview Scoring at ECF 2 [Doc. No. 92-39].

### D. Montgomery's Application Process

Montgomery was on a leave of absence in September 2020 when Alexion announced the restructuring. Defs.' SOF ¶¶ 72–73 [Doc. No. 92]; Pls.' Opp'n Ex. 2, ¶ 9 [Doc. No. 96-2] (Montgomery Aff.). On September 30, 2020, Ferguson emailed Montgomery, asking whether Montgomery would "be able to apply to roles [she was] interested in by" October 2, 2020, the established application deadline. Ferguson and Montgomery Emails at ECF 2 [Doc. No. 92-19]. On September 30, 2020, Montgomery discussed the application process and Montogomery's interest in the new positions with Moy, the Senior Director of Neurology for Patient Services. See Defs.' Reply Ex. C, at ECF 2 [Doc. No. 100-3]; Pls.' Opp'n Ex. 88, at 58 ("Montgomery Depo.") [Doc. No. 96-88].

Montgomery applied to two positions, as discussed below. See Montgomery Depo. 61–62 [Doc. No. 96-88]. She interviewed on October 8, 2020. See Interview Scoring at ECF 3 [Doc. 92-39]. Alexion filled one position with a younger, higher scoring internal candidate and did not offer the second position to any internal candidate. See id.

On October 30, 2020, Defendant Leese notified Montogomery that she had not been hired for either position. See Montgomery Depo. at 34 [Doc. No. 96-88]. Subsequently, Montgomery met with Moy, seeking feedback on her interview. See id. at 149–50. Moy cited deficiencies with Montogomery's "Patient Advocacy Plan" as contributing to Alexion's hiring decision. See id. at 149.

6

### E.  Zuckerman's Application Process

Zuckerman applied to two Patient Navigator roles (Level 7) and three positions at issue here (two PEM positions and one position outside Patient Services, discussed further below). After submitting her applications, Zuckerman met with Moy on September 28 and 30, 2020. See Defs.' Reply Ex. B, at 2–3 [Doc. 100-2].

Zuckerman was interviewed for the four Patient Services positions on October 13, 2025. Alexion did not extend an interview to Zuckerman for the position outside of Patient Services. Defs.' SOF ¶ 95 [Doc. No. 92]. Alexion management notified Zuckerman on or about October 15, 2020, that she was not hired for either of the two PEM positions at issue here, but that Alexion was offering Zuckerman the Patient Navigator position. See Pls.' Opp'n Ex. 91, at 108 ("Zuckerman Depo.") [Doc. No. 96-91].

Alexion ultimately did not hire an internal candidate for either of the two PEM positions and instead hired external candidates. See Interview Scoring at ECF 2–3 [Doc. 92-39].

### F.  Plaintiffs' Report Concerns regarding the Interview and Hiring Processes

All three Plaintiffs complained about the hiring process. After learning that they did not receive an offer for any of the positions to which they applied, Montgomery and Frenette each independently reported to Ferguson their concerns regarding the restructuring hiring process. See Defs.' SOF Ex. 23 ("Montgomery Report Emails") [Doc. No. 92-23]; id. Ex. 26 ("Frenette Report Emails") [Doc. No. 92-26]. In early November 2020, an internal investigator interviewed Montgomery about "concerns about the EEO policy violation. That [the hiring panel] hadn't considered [her] qualifications, [her] work performance" and Frenette about concerns regarding the "unfairness of the interviews." Defs.' SOF Ex. 25 ("Investigator Notes") [Doc. No. 92-25]. Frenette and Montgomery also reported concerns that while certain employees were told to

prepare presentations and other materials for the interviews, such as 30-60-90 day plans, Frenette and Montgomery had received no such guidance. See id. at ECF 4–5. Additionally, both reported that other candidates had been told to apply to positions outside of their home regions, whereas Montgomery and Frenette were told they were only permitted to apply to roles based in their regions of residence, narrowing their options. See id.

Zuckerman reported similar concerns to Ferguson, see Defs.' SOF Ex. 28 ("Zuckerman Report Emails") [Doc. No. 92-28], and was also interviewed in early November by the investigator, see Defs.' SOF Ex. 29, at ECF 3–6 ("Zuckerman Investigator Notes") [Doc. No. 92-29]. Zuckerman told the investigator that she believed Alexion preferred office-based, rather than field-based, internal candidates and that other candidates had been told to apply for roles outside their home regions and to prepare additional materials for the interviews. See id. Further, Zuckerman reported to the investigator that she had "been seeing age bias" in Alexion's hiring decisions during the restructuring process and that older and more experienced employees had been passed over for "leadership and PEM roles," while Alexion hired "people who have little experience [who were] young and in the office." Id. at ECF 4.

On November 20, 2020, the internal investigator reported that all complaints raised by Plaintiffs were unsubstantiated and that there was no evidence of age discrimination or unfair treatment during the restructuring process. See Defs.' SOF Ex. 31, at ECF 11–13 [Doc. No. 92-31] (Investigation Summary).

### G.  Plaintiffs Decline Level 7 Positions and their Employment is Terminated

On November 6, 2020, Zuckerman declined Alexion's offer of the Patient Navigator (Level 7) position. See Defs.' SOF ¶ 123 [Doc. No. 92].

In late November, Alexion offered Montgomery a position as a Patient Navigator. See Montgomery Depo. 107 [Doc. No. 92-7]. Alexion also offered to hire Frenette as a Patient Liaison. See Frenette Depo. 149 [Doc. No. 92-6]. Both Montogomery and Frenette declined the job offers for these Level 7 positions in December 2020. See Montgomery Depo. 119 [Doc. No. 92-7]; Frenette Depo. 148–49 [Doc. No. 92-6].

Plaintiffs' employment ended on March 1, 2021, when their roles were officially eliminated. See Defs.' SOF ¶ 126 [Doc. No. 92].

## II.    Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 323–25.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 324. The non-moving party cannot oppose a properly supported

summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings."

Anderson, 477 U.S. at 248. Rather, the non-moving party must "go beyond the pleadings and by

[his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at

324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will

not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly

supported evidence in the light most favorable to the non-movant and draw all reasonable

inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge . . . ruling on a motion for summary

judgment . . . ." Anderson, 477 U.S. at 255.

### III.    Count 1 – Age Discrimination[5]

"Massachusetts's antidiscrimination statute forbids employers from discriminating against

or terminating employees based on their age." Dusel v. Factory Mut. Ins. Co., 52 F.4th 495, 503

(1st Cir. 2022) (citing Mass. Gen. Laws ch. 151B, § 4(1B)). "Because . . . direct evidence [of

discriminatory animus and causation] 'rarely exists,' . . . an employee plaintiff [asserting

discrimination] may . . . survive [a summary judgment motion] by providing 'indirect or

---

[5] Plaintiffs style Count 1 of their Complaint as "Age Discrimination" without identifying the source of law. Compl. ¶¶ 140-146 [Doc. No. 1-1]. Where Plaintiffs commenced this action in Massachusetts Superior Court, Count 3's claim of retaliation identifies "[Massachusetts General Law c.] 151B ['Chapter 151B'] § 4 and 4(4A)" as the source of law, Defendants removed the action based on diversity, not federal question, jurisdiction, see Notice of Removal [Doc. No. 1], and the parties' consistently referenced "Massachusetts law," see Defs.' Mem. 20 [Doc. No. 91]; Pls.' Opp'n 18 [Doc. No. 97], the court construes Count 1 as alleging a violation of Chapter 151B, § 4(1B).

circumstantial evidence . . . using the three-stage, burden-shifting paradigm first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973).'" Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 680–81, 46 N.E.3d 24, 32 (2016) (quoting Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 39–40, 825 N.E.2d 522, 530 (2005)). While the plaintiff bears the burden of producing evidence that the employer's reasons are pretextual under the McDonnell Douglas tripartite framework, the burden of persuasion at summary judgment remains with the defendant, who "as the moving part[y], 'ha[s] the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [it] would not have the burden on an issue if the case were to go to trial.'" Bulwer, 473 Mass. at 683, 46 N.E.3d at 34 (quoting Sullivan, 444 Mass. at 39, 825 N.E.2d at 529).

"Summary judgment is disfavored in discrimination cases based on disparate treatment because the question of the employer's state of mind (discriminatory motive) is 'elusive and rarely is established by other than circumstantial evidence.'" Sullivan, 444 Mass. at 39, 825 N.E.2d at 529 (footnote omitted) (citing Blare, 419 Mass. at 439, 646 N.E.2d at 111).

## A. Plaintiffs' Prima Facie Case

Under the tripartite McDonnell Douglas framework, a plaintiff bears the initial burden of establishing a prima facie case of age discrimination. The burden here "is not onerous." Sullivan, 444 Mass. at 40, 825 N.E.2d at 530. The plaintiff "must simply produce sufficient evidence that [defendant's] actions, 'if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" Id. (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

Generally, in a failure to hire case, an age discrimination plaintiff must demonstrate that "(1) the plaintiff was a member of the class protected by [Chapter] 151B, that is, over forty years

11

of age; (2) he was qualified for the job; (3) despite his qualifications, he was not hired for the job;" and (4) a person with similar or inferior qualifications who was at least five years younger than the plaintiff was hired." Somers v. Converged Access, Inc., 454 Mass. 582, 595, 911 N.E.2d 739, 752 (Mass. 2009) (citing Knight v. Avon Prods., Inc., 438 Mass. 413, 420–21, 780 N.E.2d 1255, 1262 (2003)). Similarly, a plaintiff whose employment is terminated will meet this burden by demonstrating that (1) the employee is a member of the protected class; "(2) had performed [the] job at an acceptable level; (3) was terminated; and (4) was replaced by a similarly or less qualified person at least five years younger." Dusel, 52 F.4th at 503 (quoting Knight, 438 Mass. 413, 420–21, 780 N.E.2d 1255, 1262, 1265 (2003) (footnote omitted)). The Massachusetts Supreme Judicial Court has cautioned that, "in some circumstances, an inference of age discrimination may be established despite the fact that the individual hired in the plaintiff's place was less than five years younger than the plaintiff." Somers, 454 Mass. at 596, 911 N.E.2d at 752–53; Knight, 438 Mass. at 425, 438 N.E.2d at 1265 (cautioning that a bright-line standard "should not be used to exclude a plaintiff who might otherwise have evidence showing that age was a factor"); see also Woodward v. Emulex Corp., 714 F.3d 632, 638 (1st Cir. 2013) ("an age disparity of less than five years, *by itself*, is too insignificant to support a prima facie case of age discrimination").

Where the employee is not replaced, such as in a reduction-in-force case, in place of the fourth element, a plaintiff must show that the termination occurred under "circumstances that would raise a reasonable inference of unlawful discrimination." Sullivan, 444 Mass. at 45, 825 N.E.2d at 533–34; see also Woodward, 714 F.3d at 638 ("The fourth prong . . . does not apply to a reduction-of-workforce case . . . where the employer does not replace the plaintiff with a new employee.").

12

Alexion does not dispute that the Plaintiffs are all over 40 years old[6] (and thus in the protected class) (element 1) and that they were not hired into the positions for which they applied (element 3).[7] See Defs.' Mem. 20–21 [Doc. No. 91]. For the purposes of this motion, Defendants' only challenge as to performance or qualifications for the position (element 2) for purposes of Plaintiffs' prima facie case is directed at Zuckerman's application for the position of Associate Director of Patient Services Training & Development. See id. at 21. Zuckerman, in her opposition, "concedes that she was not qualified for the Associate Director position[.]" Pls.' Opp'n 19 n.7 [Doc. No. 97].

The court turns to the fourth element of Plaintiffs' prima facie case. Again, for purposes of the motion, Alexion challenges only Zuckerman, arguing that she has not carried her burden on the fourth element as to the two PEM positions because neither of the candidates selected by Alexion was more than five years younger than Zuckerman. See Defs.' Mem. 20–21 [Doc. No. 91] (citing Woodward v. Emulex Corp., 714 F.3d at 638).[8] Alexion hired external candidate M.D., aged 48, for the PEM Complement position, and external candidate J.G., aged 55, for the PEM Neurology, West position. See Interview Scoring at ECF 3 [Doc. No. 92-39]. Zuckerman argues that M.D. and J.G.'s ages are irrelevant because she reported her concerns internally to Ferguson before Alexion hired the external candidates. See Pls.' Opp'n 19–21 [Doc. No. 97] (citing Somers

---

[6] Frenette was 56 years old, Montgomery was 55 years old, and Zuckerman was 52 years old at the time of the alleged adverse actions. See Defs.' SOF ¶¶ 62, 83, 98 [Doc. No. 92].

[7] Frenette applied to four positions, all in the Complement and Neurology groups: two PEM positions (Level 9) in the Northeast region; and two PEM Lead positions (Level 11). See Frenette Depo. at 88–90 [Doc. No. 92-6]. Montgomery applied to two Level 9 roles: PEM, Neurology in the Northwest region, and Senior Manager for Patient Engagement. See Montgomery Depo. at 61–62 [Doc. No. 96-88]. Zuckerman applied to two PEM roles (Level 9), and an Associate Director role (Level 10) outside of the Patient Services group. Zuckerman Depo. at 72 [Doc. No. 96-91].

[8] Defendants also argue that the selected candidates were in the "age-protected class." See Defs.' Mem. 20 [Doc. No. 91]. But Massachusetts does not require for a prima facie case that the individual hired be outside of the protected class.

v. Converged Access, Inc., 454 Mass. 582, 597, 911 N.E.2d 739, 753 (2009) and Loeb v. Textron, Inc., 600 F.2d 1003, 1013 (1st Cir. 1979)).

The instant case involves neither a pure reduction-in-force nor a strict termination-replacement scenario. Alexion eliminated Zuckerman's role and offered her the opportunity to apply to newly created positions. Where Alexion did not fill the positions until months after Zuckerman was turned down for the position, the court finds guidance in the reduction-in-force framework, where a plaintiff must show that the termination occurred under "circumstances that would raise a reasonable inference of unlawful discrimination," Sullivan, 444 Mass. at 45, 825 N.E.2d at 533–34, and the Knight court's caution against use the use of a bright-line standard where a plaintiff might otherwise have evidence showing that age was a factor, see Knight, 438 Mass. at 425, 780 N.E.2d at 1265. Here, Zuckerman scored well in her interview for the PEM roles, earning 21.5 out of 25 points. See Interview Scoring at ECF 3 [Doc. No. 92-39]. She received the same score as 49-year-old T.J., who had applied for the same positions and was hired for a third PEM position (where she was competing against 55-year-old Plaintiff Montgomery). Id. Another candidate with virtually the same score (21.65) as Zuckerman and T.J., 37-year-old C.A, was selected for a PEM Lead role, and two other candidates with lower scores of 21.00 (K.W, age 42, and L.J., age 38) were selected for two more PEM roles. Id. In Zuckerman's case, despite her equivalent or better score, the two PEM roles she applied to were not filled during the internal hiring process.

While the external candidates Alexion selected were not five years younger than her, Zuckerman's other evidence, including her strong interview performance, Alexion's hiring of younger internal candidates with equal or lower scores for other PEM positions, and the hiring of external candidates close to her age but only after she complained of age discrimination, is

14

sufficient to carry her non-onerous burden to show "circumstances" that would support a reasonable inference of discrimination. Sullivan, 444 Mass. at 45, 825 N.E.2d at 533–34; see Adams v. Schneider Elec. USA, 492 Mass. 271, 281, 210 N.E.3d 917, 927 (2023).

Accordingly, Zuckerman has met her prima facie burden with respect to Alexion's rejection of Zuckerman's two PEM applications. See Sullivan, 444 Mass. at 45, 825 N.E.2d at 533–34 (plaintiff's initial burden "is meant to be a 'small showing' that is 'easily made.'") (quoting Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003)). Given Alexion's assumption of the same for Frenette's and Montgomery's prima facie cases, the burden shifts to Alexion to provide a non-pretextual reason for its decision not to hire Plaintiffs for the contested positions. See Bulwer, 473 Mass. at 681, 46 N.E.3d at 33.

### B. Defendants' Nondiscriminatory Reason for the Decisions

"In the second stage [of the paradigm], the burden of production shifts to the employer to 'articulat[e] a legitimate, nondiscriminatory reason for its . . . decision.'" Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 397, 50 N.E.3d 778, 793 (2016) (quoting Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441, 646 N.E.2d 111, 115 (1995)). Alexion must respond to Plaintiffs' showing "by articulating a lawful reason for its employment decision and producing credible evidence that the reason or reasons advanced were the real reasons." Sullivan, 444 Mass. at 50, 825 N.E.2d at 538 (cleaned up); see Woodward, 714 F.3d at 638 (quoting McDonnell Douglas, 411 U.S. at 802). Alexion's "burden at this stage is one of production and not persuasion; it need not prove that the reasons were nondiscriminatory." Sullivan, 444 Mass. at 50, 825 N.E.2d at 538 (quotation marks omitted).

Alexion contends that its hiring decisions regarding Frenette, Montgomery, and Zuckerman were based on "legitimate, non-discriminatory reasons." Defs.' Mem. 22 [Doc. No.

15

91]. Alexion argues that the internal hiring decisions were based on interviews alone and that the internal candidates hired as PEMs and other managerial positions significantly outperformed Plaintiffs during the October 2020 interviews. See id.

### 1. Frenette

Alexion hired internal candidates who outperformed Frenette in the interview process as to all four positions to which she applied. See Interview Scoring at ECF 2–3 [Doc. 92-39].[9] The difference in interview scores meets Alexion's burden of production as to its hiring decision regarding Frenette. See Scarlett v. City of Bos., 93 Mass. App. Ct. 593, 599–600, 107 N.E.3d 1179, 1186 (2018) (substandard performance is a legitimate reason to not renew an employees' contract).

### 2. Montgomery

Similarly, Alexion also hired an internal candidate who outperformed Montgomery during the interview process for the PEM position to which she had applied. See Interview Scoring at ECF 3 [Doc. 92-39].[10]

Montgomery also applied for the Senior Manager for Patient Engagement position, and Alexion hired no internal candidate for this position. See id. The three internal candidates scored

---

[9] M.G. was hired as the PEM Lead for the Complement group and C.A. was hired as the PEM Lead for the Neurology group. Interview Scoring at ECF 2 [Doc. No. 92-39]. M.G., who was 43 years old, scored 23.83 points and C.A., who was 37 years old, scored 21.67 points, while Frenette scored only 17.50 points. Id. 42-year-old K.W. was hired as the PEM for the Northeast Complement group and W.B. was hired as the PEM for the Northeast Neurology group. Id. K.W., who was 42-years old, scored 21 points W.B., who was 36 years old scored 24.33 points, while Frenette scored only 18.17 points. Id. at 2–3.

[10] T.J. was hired as the PEM for the Northwest Neurology group. Interview Scoring at ECF 3 [Doc. No. 92-39]. T.J., who was 49 years old, scored 21.5 points, while Montgomery scored 15 points. Id.

between 13 and 17 points out of 25 in their interviews, and no internal candidate who scored below 20 points was hired for any of the roles at issue in this litigation. See id. Alexion contends that, based on the interview performance of the internal candidates, the company decided to broaden its search to external candidates better suited to the role. See Defs.' Mem. 23 [Doc. No. 91]. The court finds Alexion's justification to not hire Montgomery for either the PEM or Senior Manager for Patient Engagement role, i.e. Montgomery's poor interview performance, meets Alexion's burden of production. See Sullivan, 444 Mass. at 43–44, 825 N.E.2d at 533 (describing lower proficiency as the most common nondiscriminatory reason for layoff in a reduction in force).

### 3. Zuckerman

Alexion's claim that the decision not to hire Zuckerman for either of the two PEM positions was based on her interview performance does not meet its burden of production, where she scored well in her interview, earning 21.5 out of 25 points for the positions. Alexion asserts that "[a]fter carefully considering Zuckerman's interview performance . . . along with the other internal candidates' performances, Alexion decided to" not hire any of the internal candidates but instead "solicit external applications for those roles[.]" Defs.' Mem. 23–24 [Doc. No. 91]. This statement, that Alexion did not hire her based on her interview performance, is insufficient where, as discussed above, Alexion hired numerous younger internal candidates with the same or lower interview scores than Zuckerman for PEM roles. See Interview Scoring at ECF 3 [Doc. No. 92-39].

While Alexion's proffered business reason based on Zuckerman's interview performance is insufficiently substantiated to be "legitimate," the court will consider the final step of the burden-shifting framework for all Plaintiffs for the sake of completeness.

### C. Plaintiffs' Response – Pretext

"At the final stage, the burden of production shifts back to the employee to produce evidence that 'the employer's articulated justification [for the adverse action] is not true but a pretext.'" Verdrager, 474 Mass. at 397, 50 N.E.3d at 793 (alteration in original) (quoting Blare, 419 Mass. at 443, 646 N.E.2d at 116).

"Massachusetts is a pretext only jurisdiction." Blare, 419 Mass. at 443, 646 N.E.2d at 116. Consequently, "an employee may survive summary judgment by producing evidence 'that the respondent's facially proper reasons given for its action against [the employee] were not the real reasons for that action,' even if that evidence does not show directly that the true reasons were, in fact, discriminatory." Verdrager, 474 Mass. at 397, 50 N.E.3d at 794 (quoting Wheelock Coll. v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 139, 355 N.E.2d 309, 315 (1976)). "Such indirect evidence is sufficient at the summary judgment stage because, '[c]ombined with establishment of a prima facie case . . . a showing of pretext eliminates any legitimate explanation for the adverse . . . decision and warrants,' but does not require, 'a determination that the plaintiff was the victim of unlawful discrimination.'" Id. (first and second alterations in original) (quoting Blare, 419 Mass. at 446, 646 N.E.2d at 117).

On a summary judgment motion brought by a defendant employer, the question for the court reduces to whether the "record demonstrates that the [employer] has shown that the [employee] will be unable to prove at trial that the stated reason for [the challenged action] was a pretext." Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129, 686 N.E.2d 1303, 1309 (1997). The burden reverts once more to Plaintiffs to, "produce evidence that the employer's articulated justification [for the adverse action] is not true but a pretext." Verdrager, 474 Mass. at 397, 50 N.E.3d at 793 (quoting Blare, 419 Mass. at 443, 646 N.E.2d 111) (internal citations

18

omitted). The First Circuit has cautioned that when "the issue becomes whether [an] employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious about granting [an] employer's motion for summary judgment.'" Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 116 (1st Cir. 2013) (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998)).

Plaintiffs contend that Alexion unfairly designed and conducted the interview process, with the intention of favoring certain younger employees. See Pls.' Opp'n 21–28 [Doc. No. 97]. Alexion argues that Plaintiffs cannot show any evidence of pretext because the Company's hiring decisions were based solely on Plaintiffs "interview performances – and there is no evidence that any other factor played a role." Defs.' Reply 10–11 [Doc. No. 100].

Leese described hiring internal candidates following the restructuring as "based on [employees'] interview performances." Leese Decl. ¶ 37 [Doc No. 92-1]. Panelists asked internal candidates four questions related to Alexion as an organization and one role-specific question. Id. ¶ 29. Each question was scored out of five points. Id. ¶ 30. "The panels then discussed who – if anyone – would be offered particular roles based on their interview performance." Id. ¶ 37. The scoring system, based on the responses to the five questions posed, did not account for consideration of additional factors, such as an internal candidate's work history and experience, length of time with company, or seniority, all of which often overlap with age.

"[C]ircumstantial evidence" here is sufficient to support Plaintiffs' showing that Alexion's interview-only hiring process was pretextual. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991). Looking at the overall scores of candidates for the positions for which the Plaintiffs applied, it appears that no internal applicants were offered a position without a score of 21.00 or greater, and none of the seven internal candidates who were 50 years or older were scored above a

19

19.8 for any position, except Zuckerman, who scored a 21.5 for the PEM role and still was not offered a position. See Interview Scoring [Doc. No. 92-39]. Selection based on an interview-only process also ignored Alexion's own EEO policy, which states that Alexion "hires, . . . promotes, and retains employees on the basis of their qualifications and work performance." Pls.' Opp'n Ex. 23 at ECF 2 [Doc. No. 96-23]. Nor does such a process correlate with any ongoing business needs identified by Alexion, and perhaps reflecting that fact, the interview-only process was not used for hiring external candidates, who presumably were evaluated based on qualifications and work experience. See Defs.' Am. Answer ¶ 135 [Doc. No. 13].

Leese states that during the "45-minute [interview] window, each candidate was free to share any information about their skills, experiences, and past performance that they believed would assist the panel in assessing the candidate's readiness and aptitude for the role(s)." Leese Decl. ¶ 35 [Doc. No. 92-1]. But the ability to introduce their skills, experiences, and past performance into the interview process may also have been impacted by Alexion's inconsistent treatment of different candidates and positions in the lead-up to the interviews. For example, with regard to one of the two PEM Lead positions to which Frenette applied, Moy, the head of the Neurology group, was on Panel D, which interviewed all of the candidates except Frenette. See Interview Scoring at ECF 2 [Doc. No. 92-39]. Interview panelists had the opportunity to review and change their interview questions after they had already learned whom they were scheduled to interview, and Moy requested that the role-specific question interview question be changed for the PEM lead interviews conducted by his panel. See Pls.' Opp'n Ex. 20 [Doc. No. 96-20]. Moy requested that candidates interviewed by his panel be asked how they would develop regional-specific strategies. Id. Moy requested this question be asked roughly a week after he met with 38-year-old C.A. in anticipation of her interview for a PEM Lead position See Pls.' Opp'n Ex. 28

20

[Doc. No. 96-28]. Shortly after meeting with Moy, C.A. emailed him her presentation regarding a regional-specific patient engagement plan she had developed for her role at Alexion before the restructuring, "circl[ing] back" on one of their topics during the meeting. Id. C.A. was ultimately hired for the PEM Lead, Neurology group position; a role to which Frenette had also applied. See Interview Scoring at ECF 2 [Doc. No. 92-39].

Additionally, Plaintiffs assert that, following the September 24, 2020 restructuring announcement, they were directed by management to apply only to positions in their home regions. See Frenette Depo. at 167 [Doc. No. 96-86]; Montgomery Depo. at 105–106 [Doc. No. 96-88]; Zuckerman Investigator Notes at ECF 4–5 [Doc. No. 92-29]. On October 12, 2020, Alexion supervisors responsible for the restructuring confirmed to each other "it looks like we do not explicitly say [in the PEM job description] that living in territory is required. . . . We did, however, state this during the info sessions we had with the team." Ferguson and Williams Emails at ECF 6 [Doc. No. 96-49]. Nevertheless, the officials permitted some internal applicants to apply to PEM positions outside of their home regions and multiple younger candidates were hired as PEMs outside of their home regions. See id.; Pls.' Opp'n 12 [Doc. No. 97]. Plaintiffs only applied to positions in their home regions. Interview Scoring at ECF 2–3 [Doc. No. 92-39].

"[T]aken as a whole rather than viewed in isolation," the record contains sufficient evidence such that a jury could reasonably infer that Alexion's single-interview hiring process was pretextually designed to make hiring decisions premised on age-related bias. Bulwer, 473 Mass. at 672, 46 N.E.3d at 35 (employee need only present evidence to allow for inference that "reasons given for [employer's] action against him were not the real reasons for that action." (internal citation omitted)); see Verdrager, 474 Mass. at 397 ("Massachusetts is a pretext only jurisdiction.") (internal citation omitted). Alexion designed a process that excluded direct

21

consideration of employees' experience, seniority, and other potentially-age related factors in hiring. Further, Plaintiffs were treated differently than other candidates during the process. Given the totality of this evidence, a reasonable jury could infer that Alexion's reason, Plaintiffs' interview performances, was not the real reason for the company's hiring decisions. See, e.g., Matz v. Univ. of Mass. Amherst, 2023 WL 8468723, at *3–4 (Mass. App. Ct. Dec. 3, 2023) (finding that soccer coach plaintiff's rebuttal evidence of win-loss records, conflicting student-athlete experiences, and mixed performance reviews was "sufficient evidence that one of the preferred reasons by [defendant] was pretextual" such that summary judgment was inappropriate).

## IV.    Count 3 – Retaliation Claims

Chapter 151B prohibits a person or employer from "discharg[ing], expel[ling], or otherwise discriminat[ing] against any person because he has opposed any practices forbidden under this chapter[.]" Mass. Gen. Laws ch. 151B, § 4(4). Retaliation under Chapter 151B is governed by a similar burden-shifting framework as that discussed above. "[T]o make out a prima facie case of retaliation" under G. L. c. 151B, § 4 (4), (4A), a plaintiff must show "that [the employee] engaged in protected conduct, that [the employee] suffered some adverse action, and that a causal connection existed between the protected conduct and the adverse action." Psy-Ed Corp. v. Klein, 459 Mass. 697, 707, 947 N.E.2d 520, 530 (2011) (internal citation omitted). For the purposes of a retaliation claim under Chapter 151B, an adverse employment action occurs when "actions taken by employers were substantial enough to have materially disadvantaged an employee." Id. at 708. Such a disadvantage must be "objectively apparent to a reasonable person in the employee's position; subjective feelings of disappointment and disillusionment will not

22

suffice." Yee v. Massachusetts State Police, 481 Mass. 290, 297, 121 N.E.3d 155, 162 (2019) (internal citation omitted).[11]

Plaintiffs assert that they lodged internal complaints following the adverse hiring decisions in November 2020. See Pls.' Opp'n 29 [Doc. No. 97]. Frenette and Montgomery internally complained in November of generalized unfairness relating to the restructuring process. See Investigator Notes at ECF 4–5 [Doc. No. 92-25] (raising concerns that some candidates had been coached to bring in extra materials or presentations to the interviews and had been told to apply to positions outside of their home regions). Zuckerman also raised complaints of unfairness and stated her belief that the process had been biased against Field Focused Case Managers. See Zuckerman Investigator Notes at ECF 2–6 [Doc. No. 92-29].

Additionally, Montgomery mentioned her concern that Alexion's EEO policy was violated, see Investigator Notes [Doc. No. 92-25], and Zuckerman also communicated her concerns of "age bias" to the internal investigator, see Zuckerman Investigator Notes at ECF 4 [Doc. No. 92-29]. Zuckerman stated to the investigator "most [PEM] and leadership roles [had been] given to people who have little experience in the company . . . and they are young and in the office. The ones that are part of the company who have a lot of experience [aged] 40–50 or above didn't get [PEM] or leadership roles." Id. At least Zuckerman's references to "age bias," and

---

[11] As the Yee court noted, under Title VII, the standard for an adverse action in a retaliation claim differs from that in a discrimination claim. 481 Mass. at 299 n.8, 121 N.E.3d at 163 n.8. The United States Supreme Court "held that adverse actions under the antidiscrimination provision are limited to conduct affecting 'compensation, terms, conditions, or privileges of employment,' but in the antiretaliation context, the challenged action must only have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting Burlington N. & Santa Fe R. R. v. White, 548 U.S. 53, 60, 62, 64, 68 (2006)). The Yee court found it unnecessary in that case to "reach the question whether to apply a different standard to defining adverse employment actions in the retaliation context under G. L. c. 151B)." Id. This court also need not resolve that issue here.

possibly Montgomery's reference to the EEO policy, constitute conduct protected under Chapter 151B for purposes of the prima facie case. See Mole v. University of Mass., 442 Mass. 582, 591, 814 N.E.2d 329, 338 n.13 (2004) (explaining standard of Mass. Gen. Laws ch. 151B, § 4(4)).[12]

The termination of Plaintiffs' employment is certainly an "adverse action" under Chapter 151B. Yee, 481 Mass. at 296, 121 N.E.3d at 162. However, Plaintiffs have offered no evidence that Alexion's termination of Plaintiffs' employment was causally connected to the protected conduct. See Pardo v. Gen. Hosp. Corp., 446 Mass. 1, 19–20, 841 N.E.2d 692, 706 (2006). Alexion announced the elimination of Plaintiffs' Field Focused Manager roles in September, before the November complaints. See Mole, 442 Mass. at 594, 814 N.E.2d at 340 ("[w]here . . . adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation.").

Plaintiffs argue instead that Alexion's failure to hire them in open PEM positions later filled by external candidates constitutes adverse action motivated by their internal complaints. See Pls.' Opp'n 29–30 [Doc. No. 97]. But the hiring scheme, with internal candidates interviewed first, and external candidates interviewed later, was in place prior to their internal complaints. Therefore, assuming arguendo that all Plaintiffs had engaged in protected conduct, they have failed to show that they suffered an adverse action causally connected to complaints of age

---

[12] Frenette's complaint did not reference discrimination at all, and Montgomery's complaint did not specifically reference age discrimination. For purposes of completeness, the court considers whether any Plaintiffs has produced evidence of an adverse action causally linked to their complaints.

discrimination. Because Plaintiffs have not made a prima facie case for retaliation and no material disputes prevent resolution, their Chapter 151B claim fails as a matter of law.

**V.    Conclusion**

Where Plaintiffs have demonstrated that sufficient evidence exists such that a reasonable jury could infer that Alexion pretextually designed a single-interview hiring process excluding meaningful consideration of internal candidates' work histories and seniority, the court DENIES Alexion's Motion for Summary Judgment [Doc. No. 90] as to Plaintiffs' age discrimination claim. The court GRANTS Alexion's Motion [Doc. No. 90] as to Plaintiffs' Chapter 151B claim against Alexion due to Plaintiffs' failure to make a prima facie case of retaliation.


IT IS SO ORDERED.

March 20, 2026                              /s/ Indira Talwani
                                           United States District Judge